**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**
_____

UNITED STATES OF AMERICA,

      Plaintiff,

    vs.                                     No.  CR 18-1568 WJ

RODOLFO RODRIGUEZ, JR.,

      Defendant.

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS**
**and**
**DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT**

THIS MATTER comes before the Court upon these motions:

- Defendant's Motion to Suppress, filed December 21, 2018 **(Doc. 27)**; and
- Defendant's Motion to Dismiss Indictment, filed August 9, 2019 **(Doc. 56)**

Having reviewed the parties' pleadings and the applicable law, and carefully considering the evidence and arguments presented at the hearing held in this matter, the Court finds that Defendant's motion is not well-taken and, therefore, is denied.

In February 2018, as a result of a passenger search, Special Agent Perry recovered a kilogram or more of heroin from Defendant Rodriguez who was traveling on an AMTRAK train going eastbound through Albuquerque.  Defendant is charged with unlawfully, knowingly and intentionally possessing with intent to distribute a controlled substance, 1 kilogram and more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §841(a)(1) and (b)(1)(A).  He contends that the drugs should be suppressed because Agent Perry searched him without consent.

The pivotal questions to be resolved are (1) whether Defendant agreed to speak with Agent Perry in the initial encounter and (2) assuming he did, whether Defendant later consented to have Perry search the white plastic bag which held vials containing marijuana.[1] Defendant's position is that he refused to speak with Agent Perry when Perry first approached him and so the encounter should have ended at that point and Perry should have moved on.  Defendant contends that Agent Perry's failure to do so violated Defendant's Fourth Amendment rights and requires suppression of all the evidence obtained as a result of the search.

As one might expect, the parties dispute the critical facts underlying the encounter, and resolution of many of those facts will rest on credibility findings.  A hearing was held on June 26, 2020.  Both Agent Perry and Defendant testified at the hearing. The most pertinent exhibits admitted during the hearing are audio recordings and transcripts of these recordings.  To eliminate confusion in the discussion of these exhibits, the Court describes these particular exhibits and will refer to them as follows:

- "Original Recording": audio recording of the encounter from Agent Perry's belt tape (Gov't Ex. 1);

- "Original Transcript": transcript from the Original Recording, done by Russin Reporting, LLC  (Gov't Ex. 3);

- "Corrected Transcript": transcript of encounter with corrections after Agent Perry listened to the Original Recording with Bose headphones, also done by Russin Reporting (Gov't Ex. 2);

- "Enhanced Recording": audio recording after defense audio consultant reduced background noise (Deft's Ex. 15); and

- "Enhanced Transcript": transcript from enhanced audio recording, done by Paul Baca Professional Court Reporters (Deft's Ex 4).

---

[1] The plastic bag, admitted as Defendant's Ex. 3, was also referred to at the hearing as a "laundry bag" because of the lettering on the white plastic bag.  Defendant testified that he used the bag for dirty clothes.  Hrg. Tr. at 69.

## BACKGROUND

### I.     Facts: Initial Encounter

On February 1, 2018, Agent Perry and Task Force Officer Seth Chavez were at the Amtrak Train Station conducting consensual encounters with passengers on the train.  When Agent Perry and Officer Chavez boarded the train, Defendant was sprawled across the front first seat in front of the coach car, lying with his head on the armrest.  While Officer Chavez remained standing at the back of the train car, Agent Perry approached Defendant.

In the Government's version of the facts, Agent Perry approached Defendant and identified himself as a police officer.  He asked permission to speak with Defendant who then unfolded his train ticket and without being asked, handed it to Perry stating that it was his ticket. Perry reviewed the ticket and immediately returned it to Defendant.  Agent Perry then requested to see Defendant's identification and in response, Defendant handed him a California identification card in the name of Rodolfo Rodriguez, Jr. with a Janesville, California address. Perry immediately returned the identification card to the Defendant.

Defendant claims that he was asleep with his eyes closed when Agent Perry entered the car, but was partially awakened by the noise of the train car door opening.  Agent Perry spoke to Defendant, introducing himself as a police officer and asking to speak with him for a moment. Defendant contends that he did *not* agree to speak with Agent Perry, but instead stated: "no, I'm asleep, here's my ticket" and then handed Perry his train ticket.  Defendant admits that he then presented his identification to Agent Perry on Perry's request but claims he did so because "he did not feel he could refuse" while Perry continued to ask questions.

## II.     Facts: Luggage Search and Pat-down Search

According to the Government, after handing back Defendant's identification, Agent Perry asked Defendant if he had any luggage that belonged to him. Defendant shook his head and Perry requested clarification whether that meant "no." Defendant replied "No, sir."  Agent Perry then asked if an unzipped gray backpack on the passenger seat next to the Defendant belonged to him. Defendant initially denied it was his, then stated that it was his bag. Perry next asked if Defendant had any other luggage and again Defendant shook his head to a side-to-side motion. Perry then asked if Defendant would consent to a search of his bag and he responded by picking up the grey backpack and emptying the contents of the backpack on the empty aisle seat directly next to him. Amidst the contents emptied from the backpack, Agent Perry observed a plastic bag within the emptied contents and asked for permission to search it.  Defendant said, "Go for it."  In the plastic bag, Perry observed several vials including one that contained a green leafy substance and one from a dispensary that consisted of an edible gummy bear.

Defendant picked up the vials and attempted to hide them behind his seat, declaring that they were all medication.  Perry instructed the Defendant to stop trying to hide the vial which he believed to be marijuana, and Defendant opened up one of closed vials and proceeded to eat the last gummy bear that was in the vial.  Based on Agent Perry's training and experience as a DEA agent, he believed the green leafy substance was marijuana and that the gummy bear was medically prescribed marijuana.  Agent Perry told Defendant to stand up, and Officer Chavez, who had been standing in back of the car,  approached at that point.

Defendant's version is different.  He testified that Agent Perry initially pointed to luggage on the top rack of the train car that did not belong to him and which he so indicated to Perry.  When Agent Perry then asked for consent to search Defendant's backpack, he told Perry that "There's

4

nothing in there, okay?" and upended the backpack to show it was empty.  Defendant testified that

he had emptied the backpack earlier in case he was "harassed." He stated that the plastic bag was

not in plain view, but was on the seat next to him lying underneath the backpack and that the vials

were under the bag.   Defendant testified that he handed Agent Perry the empty backpack but Perry

went for the plastic laundry bag and picked it up so that the vials were exposed.  Defendant stated

that he opened the vial containing the one remaining gummy bear and ate it because it "belongs to

me."  Hrg. Tr. at 30:15-17.[2]

## III.    Facts: Pat-down Search

Agent Perry ordered Defendant to stand up and place his hands on the luggage rack above

the seats so a pat down could be performed.  Defendant refused, saying he wanted to sleep.  Special

Agent Perry again ordered Defendant to stand up and informed him that "I'm not asking you"

noting that his partner Officer Chavez was standing by to assist. Defendant eventually complied

with Agent Perry's order to stand up so a pat down search could be performed.  Perry conducted a

pat-down search incident to arrest and during the search, Perry felt a large, round-shaped bundle

underneath the Defendant's pants and in between his legs which Perry believed to be illegal

narcotics. Perry handcuffed the Defendant after there was some resistance and escorted him off

the train. In a private area off the train, Perry opened up the zipper to Defendant's pants and saw a

rolled-up bundle of U.S. currency attached to Defendant's underwear with a rubber band. Perry

also observed plastic tape attached to the Defendant's person holding a round-shaped bundle

between Defendant's legs. Upon arriving at the offices of the Drug Enforcement Administration

("DEA"), Perry field-tested the contents of the round-shaped bundle and determined that the

---

[2] On cross-examination, Defendant testified that he decided to eat the gummy bear "[b]ecause I couldn't find another better time." Hrg. Tr. at 58:24-25.

bundle contained approximately 1.10 gross kilograms of heroin. The bundle of cash secured to the Defendant's underwear was likewise seized, totaling to an amount of $2,300.00 in U.S. currency.

## DISCUSSION

The Fourth Amendment protects "people" against unreasonable searches and seizures conducted by law enforcement officers or other government agents. U.S. Const. amend. IV; *Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that the "Fourth Amendment protects people, not places"). In determining whether a seizure comports with the strictures of the Fourth Amendment, courts have identified three categories of police citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment, (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity, and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause. *Latta v. Keryte*, 118 F.3d 693, 698 (10th Cir. 1997).

Searches conducted without a warrant are per se unreasonable under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions." *Id*. at 357. One such exception to the warrant requirement is "a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S.218, 219 (1973). In order for a search by consent to be valid, the Government has the burden of proving that consent was: (1) unequivocal, "freely and voluntarily given"; and (2) without duress or coercion, express or implied. *Schneckloth* at 222; *U.S. v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Mere submission to lawful authority does not equate to valid consent. *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993). On a motion to suppress, the burden of proving that consent to search was given freely and voluntarily is always on the Government. *U.S. v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993).

Courts apply an objective reasonableness test to measure the scope of a person's consent, based on a totality of the circumstances surrounding the search. *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004). In determining whether the Government has met its burden, the Court must consider the totality of the circumstances. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991) (citing *Schneckloth*, 412 U.S. at 227, 232–33, 249)). The Court may exclude unlawfully seized evidence in criminal prosecutions where a defendant's Fourth Amendment rights has been violated. *United States v. Herrera*, 444 F.3d 1238, 1248 (10th Cir. 2006) (citing *Illinois v. Krull*, 480 U.S. 340, 347 (1987)).

Defendant contends that Agent Perry should have immediately ended the encounter after he told him "no, I'm asleep" and that by continuing the encounter, Perry violated his Fourth Amendment rights by continuing the initial encounter. Any evidence recovered from the subsequent search of his backpack or belongings should therefore be suppressed as a result of the alleged Fourth Amendment violation. Defendant also maintains he consented to the search of his backpack by turning it upside down but did not consent to the search of the plastic bag in which the vials were found and thus any evidence found subsequent to that search must be suppressed on that basis as well.

## I.     Initial Encounter

The question here is whether Defendant refused to speak with Agent Perry and whether Perry continued the encounter in violation of Defendant's Fourth Amendment rights.

Agent Perry testified that he did not hear Defendant either refusing to speak with him or telling him he was asleep. Perry's report is consistent with Perry's testimony as it does not indicate Defendant said he was asleep. The report states that: Perry displayed his DEA badge, identified himself as a police officer, asked for permission to speak with Defendant and that Defendant

unfolded his Amtrak train ticket folder and handed it to Perry while stating, "This is my ticket." Deft's Ex. 11 at 4.  However, the three transcripts admitted at the hearing show different responses by Defendant after Agent Perry identified himself as a police officer and asking Defendant if he could speak to him "for a moment":

Original Transcript: "INAUDIBLE" where Defendant claims he told Perry he was asleep. Ex. 3 at 2:5.

Corrected Transcript: "I'm asleep. Here's my ticket." Ex. 2 at 2:5-6.[3]

Enhanced Transcript: "No, I'm asleep. Here's my ticket." Ex. 4 at 2:7-8.

The Court is able to hear the word "I'm asleep" when listening to the Enhanced Recording, but this perception may be partially due to the assistance of both the Corrected and Enhanced Transcripts. The Court, however, was not able to make out the word "no" clearly at all—it sounds more like a low groan on the audio recording.

Regardless of whether or not Defendant actually told Agent Perry that he was asleep, the relevant inquiry is whether Agent Perry *heard* it, which raises credibility issues.

At this point, the Court finds it necessary to address some concerns raised by defense counsel pertaining to Agent Perry's credibility. Defendant suggests that Agent Perry's credibility is suspect because in *U.S. v. Rangel*, the Tenth Circuit called Agent Perry's credibility into question. 519 F.3d 1258 (10th Cir. 2008). An issue of perjury arose in *Rangel* because of "contradictions" between sworn statements by Agent Perry and testimony by the bus driver and a passenger relating to who saw defendant remove a bag containing cocaine from a larger bag he carried onto a Guadalajara Tours bus in El Paso.  *Id*. at 1259.  Defendant also points to two decisions by United States District Judge Martha A. Vazquez, *U.S. v. Muse* and *U.S. v. Garcia-*

---

[3] Agent Perry testified that although he did not hear Defendant say he was asleep during the encounter, he was able to hear "I'm asleep" when he listened to the Original Recording with his Bose headphones.

*Guzman,* in which the court granted motions to suppress largely because the court did not find Agent Perry to be credible. *See U.S. v. Darius Muse*, 17-CR-02008 MV, Doc. 71, filed Dec. 20, 2019 and U*.S. v. Garcia-Guzman*, 19-CR-1086 MV, Doc. 42 filed Jan. 7, 2020.

None of these decisions offer any basis to discredit Agent Perry's credibility in this case. First, *Rangel* never found that Perry gave false testimony or was not credible.  Second, there is no justification to apply credibility findings in one case to another. Each case and all testimony should be considered independently. As the Government points out, Judge Vazquez recently credited Perry's testimony as credible and denied defendant's motion to suppress.  *U.S. v. Manuel Delgado-Salazar,* 19cr01195 MV, Doc. 57.

> A.      The Court Favors Agent Perry's Testimony

Defendant claims that he made it clear to Agent Perry that he refused to speak with him, while Agent Perry contends that he did not hear Defendant say "no" and that Defendant did not appear to be asleep."  Defendant testified that he said "no" "half a dozen times," although the transcripts do not reflect this. Perry stated that Defendant's eyes were open, squinting and looking at him.  Defendant stated that he may have mumbled something while he was "groggy" from sleep, Hrg. Tr. at 22:13-14, but if Defendant was prone to talking while asleep, Perry was not obliged to make an inquiry into Defendant's sleep habits before continuing the encounter. The Court finds that, after considering all the evidence and testimony, Defendant's version of events contains certain weaknesses and allows the Court to credit Agent Perry's version of events for these reasons:

(1) First, the Court finds it somewhat questionable that Defendant was able to make these statements, tell Perry he was asleep, and then immediately hand Perry his train ticket—all within a few seconds—and all while he was "asleep" or even "groggy."

(2) Agent Perry's testimony that he did not hear Defendant saying "No, I'm asleep" is bolstered by the fact that even Defendant found it necessary to enhance the audio recording in order to make those words audible.

(3) Defendant testified that he had prior encounters with Perry:

(a) he first met Perry several years in 2016 getting off an Amtrak train coming from California to purchase Native American "trinkets." Hearing Transcript ("Hrg. Tr.") at 3. On reboarding the train, he saw Agent Perry on the train bent over and looking through luggage and started asking Defendant questions.  Defendant told Perry that he wanted to go back to his seat and that he was blocking the hallway.  Perry excused himself and Defendant returned to his seat.

(b) Defendant met up with Agent Perry a second time prior to 2018 while riding a Greyhound bus. Defendant told Perry when he approached, "I don't have time for you"— after which Agent Perry walked away.

(c) A third encounter occurred on a train in 2017.  Defendant testified that Perry asked for his ticket and then tried to get him off the train and Defendant told him he would not get off the train because he was asleep, and Perry walked away.  Hrg. Tr. at 5. Defendant also believes that he may have seen Perry a fourth time sometime in 2017 or 2018 in Janesville, California leaving a house of an acquaintance from Mexico, but there was no interaction between Defendant and Agent Perry in that instance.

There is some significance, although limited, to these prior encounters between Defendant and Agent Perry: Defendant's testimony that Perry moved on when he refused to speak with him bolsters Perry's testimony that he ends the encounter when a passenger unequivocally refuses to speak with him.  Additionally, Defendant's testimony about prior encounters with Perry undercuts

Defendant's claim that Perry "harassed" him with questions during the initial encounter and renders credible Perry's testimony that he did not hear Defendant say "No, I'm asleep." Defendant claims to have said "no" half a dozen times, Hrg. Tr. at 22:19-20, but there is no evidence to support this, either from the transcripts or Defendant's Enhanced Recordings.

(4) Defendant claims that he made other statements to Agent Perry that are absent from the recording. He contends that either the recording was altered or Agent Perry rewound his belt tape in order to erase his statements because he heard a "zipper" sound on the recording which could be the sound of Perry's belt tape rewinding.

Defendant testified that he partially awoke when he heard Agent Perry open the train car door and approach him while he was lying across the front seat. He recognized Perry's voice even before he identified himself from several prior encounters (described above). As Perry started to speak, Defendant interrupted him and stated: "I know who you are and know you can't search me." The Court attributes no weight to Defendant's claim that the audio recording was modified or that Agent Perry rewound it to erase Defendant's initial statements to him. On cross-examination, Defendant conceded that the defense team's own audio expert who enhanced the recording found there was no evidence of manipulation or alteration "in any way." Hrg. Tr. at 53:21-25; 54:1-5. Moreover, Defendant did not testify that he heard the rewind sound during the encounter, but rather he testified that he heard this rewind sound afterward when listening to the recording itself. Hrg. Tr. at 12:13-20. Thus, the Court does not credit Defendant's testimony that he made the statement "I know who you are and know you can't search me."

For these reasons, the Court finds credible Agent Perry's testimony that he did not hear Defendant tell him he was asleep and so Perry did not violate Defendant's Fourth Amendment rights by continuing the encounter and asking Defendant for identification.

11

B.     Defendant Indicated Consent to Continue Encounter

The Government argues that even if Agent Perry heard Defendant say "no, I'm asleep," Defendant's subsequent gesture—handing over his ticket—constituted consent to continue the encounter, and the Court agrees.

Non-verbal consent may validly follow a verbal refusal. *United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007) (a palms-up signal indicated consent where defendant initially refused consent but then eventually extended both hands palm up in request for consent a second time) (citing *United States v. Flores,* 48 F.3d 467, 468–69 (10th Cir.1995)). Consent must be unequivocal and specific but it need not be verbal and "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *Guerrero,* 472 F.3d at 789–90). Even assuming that Defendant was barely awake when he handed Perry his ticket, there is no legal authority for the proposition that being wakened from sleep attenuates the voluntariness of subsequent actions, although a court would be able to take this into account as just one of the factors in a "totality" approach to the analysis. However, handing over the ticket to Agent Perry weighs heavily against finding that Defendant did so involuntarily because he had been asleep, particularly because Defendant then also presented identification to Perry on request.

Defendant nonetheless maintains that this was not a consensual encounter.  He testified that he handed over his ticket—and then his identification—because he felt obliged to cooperate with Perry's requests and hoped that Perry would leave.  However, repeated requests for consent do not violate the Fourth Amendment, even where consent is initially refused.  *See U.S. v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993) (finding that the officers' repeated requests for consent—even where defendant refused consent—the presence of more than one officer, and the failure to be

advised of his right to refuse consent did not render consent involuntarily in totality of circumstances). Agent Perry was not required to back off as long as the encounter was consensual. *United States v. West*, 219 F.3d 1171, 1176 (10th Cir.2000) (A consensual encounter is a voluntary exchange between the officer and the citizen in which the officer may ask non-coercive questions). Defendant may claim he complied with Perry's requests because he felt obliged to do so, but his nonverbal conduct relayed to Agent Perry that Defendant consented to continue the encounter. *See United States v. Gordon*, 173 F.3d 761 (10th Cir.1999) (fact that defendant later complained that he "felt obligated to comply" with the officer's order did not eliminate or attenuate the voluntariness of the consent).

Defendant also contends that Agent Perry should have ended the encounter after he returned Defendant's identification but this argument conflates a consensual encounter with a detention which is based on an officer having reasonable suspicion to stop an individual.  In such a situation, the Fourth Amendment requires that the duration of the stop be limited to the scope and duration of its  purpose. *See, U.S. v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013) (Once reasonable suspicion has been dispelled, "[e]ven a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment"; *United States v. Rosborough*, 366 F.3d 1145 (10th Cir. 2004) (an investigative stop must be "temporary and last no longer than is necessary to effectuate the purpose of the stop") (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  Here, however, the encounter was consensual.

An encounter, on the other hand, is consensual when a reasonable person would believe he was free to leave or disregard the officer's request for information. *U.S. v. Manjarrez*, 348 F.3d 881, 885-86 (10th Cir. 2003).   The question of whether an individual consents to further questioning is based on the totality of the circumstances.  *Id.*  Defendant voluntarily handed over

his ticket to Perry and then continued to participate in the encounter by immediately providing his identification papers on request.

Courts have identified several factors that lead a reasonable person to believe he is not free to disregard the police officer, including: the threatening presence of several officers, the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or small enclosed space; and absence of other members of the public. *See United States v. Zapata*, 997 F.2d 751, 757 (10th Cir. 1993); *see also United States v. Abdenbi*, 361 F.3d 1282, 1291 (10th Cir. 2004) (the list of relevant factors is non-exhaustive and no one factor is dispositive).  There is no evidence of coercion during this encounter based on the following evidence:

- There was no show of force or physical contact: only Agent Perry and Officer Chavez had boarded the train, and Defendant testified that he first noticed Officer Chavez only when Perry told Defendant to stand after his luggage was searched.

- Perry testified that he was armed, but the weapon was not visible;

- The recording supports a finding that no aggressive communications were used;

- Perry immediately returned both Defendant's ticket and identification;

- Defendant contends that he was not advised of his "right to refuse to answer questions" (Doc. 35 at 4), but police do not have to inform an individual of his right to refuse or disregard further questioning for the encounter to be consensual. *U.S. v. Manjarrez*, 348 F.3d 881, 885-86 (10th Cir. 2003);

- Defendant claims that Perry "harassed" him  and "kept stalking" him, repeatedly asking to engage him in the encounter and refusing to speak with Perry three times: (1)  first telling Perry, "I know who you are and no, you can't search me"; (2) then after Perry introduced himself as a police officer; and then finally (3) after Perry identified himself as "security," to which Defendant responded, "No, I'm asleep" and handed Perry his ticket.  Hrg. Tr. at

8:13-16. However, the Enhanced Recording (Deft's Ex. 15) indicates that Perry asked him to participate in the encounter only once.

> Perry: Hello, sir. How are you doing today?
>
> Deft:   Good.
>
> Perry:  How are you doing, sir? Sir, I'm a police officer. I check the train here for security. May I speak to you for a moment?
>
> Deft:   No, I'm asleep.

Deft's Ex. 4 at 2:1-8. As the Government noted, the exchange between Defendant and Agent Perry lasted only a few seconds. Defendant handed over his ticket without being asked and while Perry did ask for identification, he handed it back to Defendant after reviewing it.[4] The Court therefore finds no evidence of coercion or harassment during this encounter.

Defendant contends that he felt obligated to comply with Perry's requests, but his testimony on whether there was egress from the train contradicts this claim. Defendant testified that he *did* feel free to walk away but did not because he "didn't do nothing wrong." Hrg. Tr. at 24:8-10. Even at the point when Agent Perry found the vials and the marijuana gummy bear, Defendant felt that he "could walk away." In other words, Defendant did not to leave the train because he was unable to leave; Defendant did not leave the train because he felt he had done nothing wrong. Hrg. Tr. at 31:22-25;32:1-2. Also, early in his testimony, Defendant claimed that Officer Chavez was blocking the aisle to the right while Perry was blocking the exit to the left. *Id.* at 10:12-15. However, he later testified that he did not notice Officer Chavez until Agent Perry told him to stand. *Id.* at 36:16-20 ("I didn't know he was standing back there, because the chairs

---

[4] Defendant relies on a Ninth Circuit case, *Garcia v. Long*, for the proposition that a suspect need only "articulate his desire" to remain silent in order for a reasonable officer to understand the statement to be a request to remain silent. 808 F.3d 771, 777 (9th Cir. 2015); see Doc. 73 ("Notice of Supp. Auth."). *Garcia* is not relevant to the instant case because *Garcia* involved a *Miranda* issue during detention and here, Defendant was never in a "custodial interrogation.". *See Miranda v. Arizona*, 884 U.S. 436 (1996). Also, *Garcia* does not alter the analysis for consensual encounters under Tenth Circuit law.

are so high you can't see behind you. The chairs are up to here, so you can't just turn around and see"). Thus, even crediting his later testimony, Defendant would not know his egress was blocked by Officer Chavez until after his luggage was searched and Perry told him to stand.

Agent Perry testified that he made certain that he did not block the aisleway and that there was egress from the train during the encounter and that Defendant "could have got up and walked away either through [the sliding door in the front of the train] or walked to the rear and went down the aisleway." Hrg. Tr. at 6:9-17. Perry also testified that when he showed Defendant his badge when identifying himself as a law enforcement officer and when he received and returned identification papers, he stepped forward and then back again to the opposite seat so as not to block the aisle. The Court finds this testimony to be credible. Perry did not explicitly advise Defendant that he was free to leave, but he was not required to do so. *See United States v. White*, 584 F.3d 935, 944–45 (10th Cir. 2009) (an explicit advisement that a citizen has a right to terminate an encounter with police is not required but is merely a factor to be considered in the totality of the circumstances); *U.S. v. Ledesma,* 447 F.3d 1307, 1315 (10th Cir.2006) ("The Supreme Court has admonished . . . that an officer's failure to inform the defendant that she is free to leave, standing alone, does not make an encounter nonconsensual.").

For these reasons, the Court finds that Agent Perry did not violate Defendant's constitutional rights by continuing the encounter after returning Defendant's identification because the encounter remained consensual and therefore did not implicate the Fourth Amendment.

## II.    Search of Defendant's Belongings

Based on a review of the audio recordings and transcripts, the encounter continued to be consensual in nature:  Agent Perry's tone and demeanor did not change; egress from the train

remained clear and there was no indication from Defendant that he no longer wished to engage with Perry.

A.    Agent Perry's Requests for Consent to Search

After returning Defendant's identification, Perry asked him whether he had luggage on the train.[5] Defendant testified that he had emptied out his backpack earlier and removed the vials out from the plastic bag because he "kind of knew" that someone was going to harass him when the train hit Albuquerque.  Hrg. Tr. at 14:11-20. He also "made sure" that the vials were not in plain view.  Hrg. Tr. at 15:5-7.  Defendant stated that his backpack was lying in the seat next to him on top of the plastic bag and the vials were under the plastic bag.  Hrg. Tr. at 14:3-4.

Defendant testified that when Perry asked to search his luggage, he told Perry there was nothing in the backpack, turned it upside down and shook it in order to show that Perry that it was empty. *Id.* at 11:1-9; 27:8-12; 69:12-13.  Perry then reached for the plastic bag without Defendant's consent, pulled the bag back and saw the vials that were lying underneath.  *Id.* at 30:1-10.  Defendant then reached down, grabbed one of the vials and opened it and ate the one gummy bear that was inside one of the vials. Tr. at 30:12-17.

The Government contends that Defendant gave consent to search the plastic bag.  Agent Perry testified that after Defendant identified the backpack as his, Perry asked him for consent to search the bag for contraband.  Defendant then "mumbled something," picked up the backpack, turned it upside-down and immediately dumped out its contents onto the empty aisle seat directly beside him.  Hrg. Tr. at 13:2-7. Perry described Defendant as "agitated at the time." *Id.*  Agent Perry testified that a "plastic shopping bag, like you get at the grocery store," came out of the bag

---

[5] The encounter continued as consensual even at this point.  Agent Perry's demeanor did not change (based on review of audio recording or transcript); egress was not blocked; nor did Defendant make it clear that he no longer wished to engage with Perry.

and was lying on the seat. He asked Defendant for consent to search the plastic bag and Defendant responded "Go for it." Perry found the vials inside the plastic bag.   The Enhanced Transcript contains the exchange between Agent Perry and Defendant with respect to the search of the backpack and plastic bag:

| | | |
|---|---|---|
| 14 (p. 2) | Perry: | Do you have luggage on the train with you today, sir? I see you're shaking your head side to side, does that mean [no]?[6] |
| 17 | Deft: | No, sir. |
| 18 | Perry: | How about this bag here, is this your bag here? |
| 20 | Deft: | No. |
| 21 | Perry: | This is not your bag here? |
| 23 | Deft: | This is my bag right here. This is only my bag right – so – |
| 25 | Perry: | **There's nothing else though? Okay. Would you consent for a search of your bag for contraband, sir?** |
| 3 (p. 3) | Deft: | There's nothing in there. Okay? Alrighty. Right? |
| 5 | Perry: | **Do you give me permission to search this bag here?** |
| 7 | Deft: | Go for it. |
| 8 | Perry: | Thank you, sir. I believe everything – and you have no luggage downstairs? |
| 10 | Deft: | No, sir. |
| 11 | Perry: | What's that? |
| 12 | Deft: | It's nothing. It's medication. |
| 14 | Perry: | I see that. I see what it was, sir. |
| 16 | Deft: | It's medication. All that is medication. |
| 18 | Perry: | Sir, you need to stop. Okay? |
| 20 | Deft: | Yes, sir. |
| 21 | Perry: | All right. Here you go. All right. It's not medication. All right. You have no luggage downstairs? Okay. Can you stand up for me, sir? |
| 25 | Deft: | (Inaudible) |
| 1 (p. 4) | Perry: | I'm sorry. |
| 2 | Deft: | Please, sir, I'm trying to go to sleep. |
| 4 | Perry: | Okay. Sir, I need you to stand up for me. |
| 6 | Deft: | I'm not going to --- |

---

[6] One can hear "no" on the Enhanced Recording although it is not included in the Enhanced Transcript.  Numbers preceding the phrases indicate the corresponding lines and pages of the Enhanced Transcript.

Deft's Ex. 4 (Enhanced Transcript) at 2-4 (emphasis added). The transcript reflects that Agent Perry asked Defendant for permission to search twice, once at page 2, line 25 and again at page 3, line 5. Defendant acknowledges that Perry asked for consent to search his luggage twice. Hrg. Tr. at 27:9-11; 65:12-13. However, his testimony is inconsistent as to which of his belongings are the subject of those requests. On direct examination, Defendant testified that both of Perry's requests for consent refer to the backpack. Hrg. Tr. at 27:8-12. In response to the first request, Defendant told Perry there was nothing in the backpack, and in response to the second, Defendant told Perry to "Go for it." On cross-examination, Defendant testified that Perry's first request referred to some luggage across the aisle on top of the luggage rack that was not his, *id.* at 65:15-19 and only the *second* request referred to the backpack. *Id.* at 66-67 (". . . but I guess what you don't see is when he steps up to me, he's not point at that black bag [backpack] I'm laying on, he's pointing at another bag across the aisle on top of the luggage rack on that corner").

Defendant's account is inconsistent and is directly contradicted by Defendant's own audio exhibit, the Enhanced Recording, Exhibit 15. This recording resolves the matter definitively and persuades the Court that Perry's second request and Defendant's response "Go for it" both refer to the plastic bag:

- Defendant clarified that the backpack was his—and the luggage on the top rack across the aisle was not—*prior* to Perry's first request for consent and therefore Perry's first request had to refer to Defendant's backpack and not the luggage on the top rack that was not his;

- On the recording and immediately *after* Perry's first request for consent, one can hear rattling and jostling sounds identified by Defendant as occurring when he upended the backpack and shook it. Hrg. Tr. at 67:5-8. The sounds last for a full ten seconds and are followed by Defendant's statement, "There's nothing in there. Okay? Alrighty. Right?" It makes no sense that Perry would then again seek consent to search a bag that had just been emptied. The only logical conclusion is that the second request had to refer to a different bag;

- One can hear a distinct inflection on the word "this" in Perry's request for consent to "search *this* bag here," signifying that the second request went to a bag that was in fact different from the backpack that had just been emptied;

- Defendant suggested that the sounds were from the clanking of the backpack straps against the armrest of the train seat rather than from the contents being dumped out. Hrg. Tr. at 57:22-25, at 67:5-8. This suggestion is difficult to accept as credible. Ten seconds seems like an inordinately long time to be emptying out an "empty" backpack. Further, the Court finds that the sounds are consistent with the sounds of contents being dumped out of a bag.

Based on the evidence and the testimony, the Court finds Agent Perry's testimony to be credible and consistent with the Government's position that Defendant consented to a search of his backpack as well as the plastic bag.

Defendant consented to a search of his backpack by upending it and shaking it. Defendant does not challenge the significance of upending the backpack and shaking it as a nonverbal consent to search. As mentioned earlier, consent can be given nonverbally and "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *See United States v. Guerrero*, 472 F.3d at 789–90); *see also United States v. Gordon*, 173 F.3d 761 (10th Cir.1999) (finding implied consent where, in response to officer's question whether defendant could open a locked bag, defendant handed the officer the key). In this case, Defendant's conduct in emptying his backpack in response to Agent Perry's request was a willing and unforced act that manifested consent.

The Court also finds, based on the evidence and testimony, that Defendant consented to a search of the plastic bag with his response, "Go for it." Therefore, Agent Perry's search of the plastic bag did not violate Defendant's Fourth Amendment rights.

C.     Probable Cause for Pat-Down and Arrest

Defendant contends that Agent Perry did not have a legal basis to search him for other drugs based on what was in the vials.

Agent Perry's search of the backpack and plastic bag (both of which the Court has determined to be legal searches) uncovered four plastic vials. Defendant's Exhibit 1 is a photo showing four plastic vials, three of which are clear and colored (white, purple and green) and one which is an opaque blue.  Another photo is a closeup of the clear purple vial labeled "Medical Cannabis" which appears to contain rolling papers. *See* Hrg. Tr. at 48:1-3.

 Defendant testified that the vials contained rolling paper and an empty vape pen, and that the vials did not contain any cannabis except for the gummy bear, which was "prescribed" although he conceded that there might have been "residue" in the vials.  Hrg. Tr. at 15:13-18; 17:6-7; 47:1-10.  Defendant stated that the clear vial "probably" contained the THC gummy bear.  Hrg. Tr. at 48:1-5.  Defendant was asked whether he could observe any marijuana or "leafy substance" in the green vial, but said he could not "make it out" and did not know what it was.

Agent Perry testified that when he opened the plastic bag, he observed several vials.  One or two were empty; one contained a gummy bear of edible THC and one contained a green leafy substance. Perry testified that, based on his experience and training and seeing those canisters "numerous times" in his career, he believed the contents were marijuana. Hrg. Tr. at 13:22-25; 14:1-12.

Defendant contends that there was no probable cause for arrest because he had a medical prescription for the gummy bears and because marijuana is legal in some states, Hrg. Tr. at 31:22-25;32:1-3; 58:7-10, but these arguments miss the mark. Marijuana possession is a federal crime under 21 U.S.C. § 844 and marijuana remains contraband under federal law whether or not it is legal for medicinal and recreational purposes.  *See United States v. Schostag*, 895 F.3d 1025, 1028 (8th Cir. 2018) (citing cases therein). Thus, possession of marijuana—with or without a medical prescription for it—is still a federal offense, providing a law enforcement officer with probable

cause to arrest.  The physical evidence as well as Defendant's own testimony supports Agent

Perry's account regarding his observations following the search of the plastic bag and the Court

finds this account to be credible. The evidence and testimony also support a finding that Agent

Perry had probable cause to arrest Defendant for possession of marijuana and to conduct a search

incident to arrest, under the totality of circumstances:

- A green leafy substance is visible through the clear green vial in Defendant's Exhibit 1. Taken together with the other evidence under a totality approach, Agent Perry could reasonably believe he had probable cause to arrest Defendant for possession of marijuana;

- Defendant testified that when Agent Perry saw the vials, he opened the one containing the gummy bear and "threw it in my mouth." Hrg. Tr. at 58:8-19. Defendant also testified that he tried to cover up the vials and Perry told him to "stop it." *Id.* at 31:13-17; 32:1-8. Perry could reasonably infer from this conduct that Defendant was trying to either hide or eliminate incriminating evidence;

- Defendant admitted that he was under the influence of cannabis at the time of the encounter. *Id.* at 59:4-6.

Defendant also claims that a full pat-down search was not justified based solely on an

empty bottle of marijuana gummy bears.  This argument ignores the evidence as well as the

relevant law.

A warrantless search preceding an arrest is a legitimate "search incident to arrest" as long

as there is (1) a legitimate basis for the arrest prior to the search, and (2) the arrest must follow

quickly thereafter. *United States v. Torres-Castro*, 470 F.3d 992, 997–98 (10th Cir. 2006) (citing

*United States v. Anchondo,* 156 F.3d 1043, 1045 (10th Cir. 1998)). Further, an officer may arrest

a person for "even a very minor criminal offense" committed in his presence without violating the

Fourth Amendment). *Texas v. Brown*, 460 U.S. 730, 742 (1983); *see Atwater v. City of Lago Vista*,

532 U.S. 318, 354 (2001); *Robertson v. Las Animas County Sheriff's Dep't,* 500 F.3d 1185, 1191

(10th Cir. 2007); *see also United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011) (probable

cause standard is something less than a preponderance, as it does not even require that an officer's suspicion about the presence of contraband be "more likely true than false").

The pat-down search was justified under these circumstances because Agent Perry had probable cause to arrest Defendant and the search occurred simultaneously with the arrest. *Anchondo,* 156 F.3d at 1045 ("whether or not the officer intended to actually arrest the defendant at the time of the search is immaterial to whether search incident to arrest is legitimate). Perry believed that he had probable cause to arrest Defendant based on the marijuana he observed and at that point wanted to confirm if Defendant had anything else on his body such as "any type of contraband or weapon, or other bundles of illegal narcotics. Hrg. Tr. at 16:9-19. Perry's experience has taught him that when people "had personal use amounts of marijuana or other drugs, . . . then they have other larger bundles on their bodies or in their bags. *Id.* Defendant initially resisted Perry's directives to stand up and put his hands on the overhead luggage compartment area, Hrg. Tr. at 38-39, but eventually complied.[7] During the pat-down, Perry felt a "very hard, round-shaped bundle that was pretty large" in the crotch area between Defendant's legs. Hrg. Tr. at 21-25;17:1-4. Agent Perry "knew" from experience that the "bundle, the location, the concealment method, and then the hardness and the shape, was a bundle of illegal narcotics that I had seen strapped to people's bodies in the past on numerous occasions." *Id.*[8]

The Court accepts Agent Perry's testimony regarding his observations and conclusions made as a result of his experience. For the above reasons, the Court finds that Agent Perry's

---

[7] Defendant admitted that he resisted "briefly" when Perry told him to put his hands up, and that there was a "minor struggle." Hrg. Tr. at 38-39.

[8] Defendant did not challenge either the scope or manner of the pat-down search either in his brief or at the hearing, and the Court will not address arguments that are not presented. *See United States v. Sineng-Smith,* 140 S. Ct. 1575 (2020) (a court must "rely on the parties to frame the issues for decision" and that courts have "the role of neutral arbiter of matters the parties present").

luggage search and pat-down of Defendant were legally justified and did not violate Defendant's Fourth Amendment rights.

## III.     Motion to Dismiss Grand jury Indictment

Defendant also moves to dismiss the indictment (Doc. 56), claiming that his Fifth Amendment rights are violated because he is being held to answer for a crime without a valid indictment of a Grand jury.  Specifically, he claims that Agent Perry misled the grand jury by testifying that he asked for and received permission to speak with Defendant when in fact Defendant refused to do so.

A court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). Dismissal of an indictment returned by a grand jury is a very drastic action. *United States v. Hillman*, 642 F.3d 929, 933–34 (10th Cir. 2011) (quoting *United States v. Pino*, 708 F.2d 523, 530 (10th Cir.1983)).   Whether to dismiss or not hinges on whether the asserted grand jury error falls into two categories: a technical or procedural error which only affects a grand jury's finding of probable cause versus an error that threatens a defendant's right to fundamental fairness in the criminal process. *See United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1244 (10th Cir. 1996).[9]  The common thread, therefore, is that a showing of deliberate government attempt to influence a grand jury is required.  *Doran v. Stratton*, 1991 WL 35249, at *2 (10th Cir. 1991) (unpublished opinion).

Defendant contends that he was prejudiced in the Grand jury proceedings when Perry testified that he asked for and received, permission to speak with him when in fact, when in fact

---

[9] *See also United States v. Crockett*, 435 F.3rd 1305, 1316 (10th Cir. 2006) (defendant failed to establish that the witness uttered a false statement, but even if he had, there was no showing of any deliberate attempt by the prosecution to unfairly sway the grand jury); *United States v. Mohawk*, 20 F.3rd 1480, 1483 (9th Cir. 1994) (there was nothing in the record suggesting that the officer knowingly gave false testimony or that the prosecutor knowingly used false testimony).

Defendant responded, "no, I'm sleeping."  By continuing the encounter, Defendant claims that Special Agent Perry violated Defendant's Fourth Amendment rights and conducted an illegal search of Defendant's bag; and by his testimony, Agent Perry led the Grand jury to believe he had conducted a legal, consensual search of Defendant and therefore there was probable cause for his arrest.

In light of the Court's findings that the encounter and luggage search was consensual, and that Agent Perry had probable cause to arrest Defendant and conduct a pat-down search after discovering the vials in the plastic bag, Defendant has no grounds on which to seek dismissal of the indictment.  The Court also found Perry's testimony to be credible and supported by the relevant audio recordings and transcripts.  Also, Perry's testimony to the grand jury is not necessarily suspect, since the Defendant's comment that he was asleep is inaudible in the Original Recording.  As discussed above, Agent Perry himself did not hear the comment until he reviewed the Original Recording with his Bose headphones, after which Perry corrected the transcript to read "I'm asleep."  Thus, Perry's testimony to the grand jury that he obtained Defendant's consent to continue the encounter is both plausible and credible, and there is no technical or procedural error which might have affected the grand jury's finding of probable cause.  Therefore, Defendant's motion to dismiss the indictment is denied.

## CONCLUSION

For the reasons described in this Memorandum Opinion and Order, Defendant's Motion to Suppress (**Doc. 27**) and Defendant's Motion to Dismiss Indictment (**Doc. 56**) are hereby DENIED.

**IT IS SO ORDERED**.

_____

**CHIEF UNITED STATES DISTRICT JUDGE**